**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | |
|---|---|
| **In re:**<br><br>**JACOB ANDREW WORLEY and TONYA MARIE WORLEY,**<br><br>**Debtors.** | **Case No. 25-10736-357**<br><br>**Chapter 12** |
| **In re:**<br><br>**JOHN DAVID MORGAN,**<br><br>**Debtor.** | **Case No. 25-10747-357**<br><br>**Chapter 12** |

**MEMORANDUM OPINION**

The United States, on behalf of the Internal Revenue Service, has moved to dismiss these bankruptcy cases, arguing that the Debtors are not family farmers and thus are not eligible to be Chapter 12 debtors. The parties' principal dispute is whether the Debtors were "engaged in a farming operation" when they filed their respective voluntary bankruptcy petitions. 11 U.S.C. § 101(18)(A).

For the reasons that follow, I conclude that the Debtors were not engaged in farming operations on their petition dates. I will thus grant the Government's motions unless the Debtors elect to convert their cases to another chapter under the Bankruptcy Code.

## I. Jurisdiction

The Court has subject-matter jurisdiction under 28 U.S.C. § 1334(b) because the issues arise under Sections 109 and 1208 of the Bankruptcy Code and arise in the bankruptcy cases of the Debtors. These are core proceedings under 28 U.S.C. § 157(b)(2)(A).

## II. Background

The Debtors commenced these cases in the last week of December 2025.[1]

Jacob and Tonya Worley farmed approximately 4,500 acres of rice and soybeans in 2023 and 2024 but did not plant a crop in 2025. Jacob has worked for two other farmers and for an excavating company during the past two years. Tonya was not employed when the Worleys commenced their case but now works at a veterinary clinic.

Between the end of the 2024 growing season and the commencement of their case, the Worleys sold all of the land that they had cultivated previously, all remaining farm equipment, and crops that they had stored after the 2024 harvest. They used the proceeds to reduce their debts. They retained a shop building, a six-acre parcel known as the "Woods Patch," and, through a corporate entity, a fifteen-acre pecan orchard.

John David Morgan began to plant approximately 4,700 acres of rice, corn, and other row crops in 2023, but his landlord terminated his lease early in the growing season. He concluded that season with 60 acres, which he owned, under cultivation. He began working full time as a manager on a large farm in Northeast Arkansas, owned by Victoria Partnership, during 2023 and continues to be employed there. He has not planted crops of his own since 2023.

Since 2023, Morgan has sold the 60 acres of farmland and most of his equipment. On the petition date, he retained a residence, some grain bins, a shed, and two farm vehicles.

The Debtors intend to return to active farming when they can. At the hearing on the Government's motion to dismiss, the Worleys explained that they have informal agreements with other farmers and landowners for the use and rental of equipment and land. They also intend to use the Woods Patch for farming, although they have not farmed it in the past and it has not been tilled for about 40 years. And they plan to cultivate pecans on their orchard. This too would be a new venture. Projections included in the Worleys' Chapter 12 plan show that they intend to harvest soybeans on 151 acres and to sell pecans beginning in 2027.

Morgan's plans are somewhat less specific. He regularly evaluates commodity prices, farm expenses, and other factors that would affect the profitability of a new farming effort. He testified that he intends to begin a renewed row-crop operation on a reduced scale when

---

[1] In accompanying Findings of Fact and Conclusions of Law, I discuss the facts in greater detail. The summary included here presents the facts at a high level and without detailed citations to the record.

he believes that it would be profitable, but he did not provide details. Morgan's plan projections do not include income from planting crops of his own. He would have to leave his job as a farm manager in Arkansas to plant crops in Missouri.

## III. Analysis

The debtor has the burden of proof to establish eligibility to proceed under Chapter 12. *In re Tim Wargo & Sons, Inc.*, 869 F.2d 1128, 1130 (8th Cir. 1989); *In re Vernon*, 101 B.R. 87, 89 (Bankr. E.D. Mo. 1989).[2] "The determination of eligibility for relief under Chapter 12 of the Code should be decided on a case by case basis." *Vernon*, 101 B.R. at 89.

Under Section 109(f) of the Bankruptcy Code, "[o]nly a family farmer . . . with regular annual income may be a debtor under chapter 12 of this title." 11 U.S.C. § 109(f). A "family farmer with regular annual income" is defined as a "family farmer whose annual income is sufficiently stable and regular to enable such family farmer to make payments under a plan under chapter 12 of this title." 11 U.S.C. § 101(19). Section 101(18)(A) explains that a "family farmer" is an "individual or individual and spouse engaged in a farming operation." 11 U.S.C. § 101(18)(A).[3] This subsection also includes a limit on the debtor's debts and requires that at least fifty percent of the debtor's "aggregate noncontingent, liquidated debts . . . on the date the case is filed, arise out of a farming operation owned or operated by" the debtor. *Id.* Additionally, "more than 50 percent of [the debtor's] gross income for . . . the taxable year preceding; or . . . each of the 2d and 3d taxable years preceding" the applicable tax year on the petition date must derive from "such farming operation." *Id.*

---

[2] The central holding of *Vernon* is that cash rent received by a farmer pre-petition qualifies as income received from a farming operation for purposes of the so-called income test in Section 101(18)(A). *See Vernon*, 101 B.R. at 91; *see also In re Hettinger*, 95 B.R. 110, 113-14 (Bankr. E.D. Mo. 1989) (similar). The Eighth Circuit disagreed with this holding, concluding later in 1989 that cash rent is not farm income unless a debtor "had some significant degree of engagement in, played some significant operational role in, or had an ownership interest in the crop production" taking place on rented land. *In re Easton*, 883 F.2d 630, 636 (8th Cir. 1989). Nevertheless, other aspects of *Vernon* and *Hettinger* were not addressed in *Easton*, and I cite the cases for those purposes in this Opinion.

[3] Different requirements apply to corporate and partnership debtors under Section 101(18)(B). These provisions are not directly applicable to this case, although some of the governing principles in this area derive from cases involving corporate debtors. *See, e.g., Tim Wargo & Sons*, 869 F.2d at 1130 (burden of proof).

### A. Were the Debtors Still Engaged in Their Historic Farming Operations When They Commenced These Cases?

As just noted, Section 101(18)(A) requires that a Chapter 12 debtor be an "individual or individual and spouse engaged in a farming operation." 11 U.S.C. § 101(18)(A). This determination is made as of the petition date. *See In re Clark*, 288 B.R. 237, 246 (Bankr. D. Kan. 2003) ("The test for a 'family farmer' as described in 11 U.S.C. § 101(18)(A) clearly provides that the debtor's status is determined at the time the case is filed."); *In re Tim Wargo & Sons, Inc.,* 74 B.R. 469, 472 (Bankr. E.D. Ark. 1987) ("In construing the term 'farming operation,' the Court must examine the debtor's activities as of the petition date."), *aff'd,* 86 B.R. 150 (E.D. Ark. 1988), *aff'd,* 869 F.2d 1128 (8th Cir. 1989).

#### 1. General principles

Determining whether a debtor is a farmer and has an active farming operation is a complex endeavor. Because the phrase "engaged in a farming operation" is not defined in the Code, I will interpret this phrase according to its plain meaning. *See United States v. Belmont*, 831 F.3d 1098, 1100 (8th Cir. 2016) ("This court assumes that Congress intended to adopt the plain meaning or common understanding of the words used in a statute.") (cleaned up).

"The plain meaning of 'engaged in' means to be actively and currently involved." *In re Thurmon*, 625 B.R. 417, 422 (Bankr. W.D. Mo. 2020); *see also In re Ikalowych,* 629 B.R. 261, 281 (Bankr. D. Colo. 2021) ("[T]he 'engaged in' phrase is used throughout the Bankruptcy Code, and it always means the same thing: that a person or entity is presently doing something."). Thus, for a debtor to be engaged in a farming operation, he or she must have been actively participating in at least some activities that qualify as a farming operation on the petition date. *See In re Comeau*, 632 B.R. 707, 712 (Bankr. D. Kan. 2021) (statute has "a temporal element (the debtor must be engaged in a farming operation on the date of filing); and a substantive element (whether the debtor's activities on that date constituted a farming operation)").

The Bankruptcy Code provides a non-exhaustive list of the types of activities that are included within the definition of "farming operation," such as "farming, tillage of the soil, . . . production or raising of crops," and other matters. 11 U.S.C. § 101(21); *see also In re Sharp*, 361 B.R. 559, 564 (B.A.P. 10th Cir. 2007) (statute "does not provide an exclusive list of all farming activities"). "This definition is to be construed liberally in order to further Congress's purpose of helping family farmers to continue farming." *Knudsen v. IRS*, 581 F.3d 696, 714

(8th Cir. 2009) (cleaned up).[4] "Implicit in this definition is the inclusion of general activities inherent in farming and . . . the means . . . necessary to perpetuate the farming operation the definition speaks of." *In re Armstrong,* 812 F.2d 1024, 1026 (7th Cir. 1987). "Courts, however, are not free to confer statutory family farmer status upon individuals simply because they reside on a farm and carry on some farm-related tasks." *Easton*, 883 F.2d at 637.

Determining whether a certain activity or set of activities falls under the definition of a farming operation requires consideration of the totality of the circumstances. *See Hettinger*, 95 B.R. at 112; *In re Jessen*, 82 B.R. 490, 493 (Bankr. S.D. Iowa 1988). And a farming operation may morph over time. *See Knudsen*, 581 F.3d at 714 (noting that debtors' farming operation "changed from a farrow-to-finish hog operation to raising pigs under a contract" with a third party).

The word "operation" also has a plain meaning; it denotes a state of activity. *See generally Easton*, 883 F.2d at 634 (rejecting argument that renting land to another constitutes farming operation because "all of [Section 101(21)'s] other operative terms describe active production of farm commodities or active working of the land."). According to a dictionary published shortly before Chapter 12 was first enacted, "operation" means "a doing or performing of a practical work or of something involving practical application of principles or processes," or "the quality or state of being functional or operative." *Webster's Third New International Dictionary* 1581 (1981). Another defines the term as "a course or procedure of productive or industrial activity" or "a process of a practical or mechanical nature in some form of work or production." *The Random House Dictionary of the English Language* 1357 (2d ed. 1987).

A farm on which agricultural activity has ceased thus does not constitute a farming operation. *See In re Chateaugay Corp.*, 891 F.2d 1034, 1036 (2d Cir. 1989) (holding that term "operations" in collective bargaining agreement does not include "a mine closed in good faith and sold by a seller that retains no financial interest in any potential future mining activity at the site"); *In re Grathwol*, 505 B.R. 201, 205 (Bankr. E.D.N.C. 2014) (noting, in course of interpreting Chapter 11 plan, that "no plain meaning analysis could interpret 'operations' as meaning dissolution of one of [debtor's] businesses"); *In re Nelson*, 291 B.R. 861, 869 (Bankr. D. Idaho 2003) ("[A] debtor who engaged in farming last tax year, but who sold the farm assets and permanently discontinued the operation before filing for bankruptcy this year

[4] The Supreme Court abrogated the core holding of *Knudsen* in *Hall v. United States*, 566 U.S. 506 (2012). Congress then overruled *Hall* in legislation enacted in 2017. *See In re Barnett*, 680 B.R. 813, 816 (Bankr. E.D. Mo. 2026). The aspects of *Knudsen* cited here are unrelated to the issue addressed in *Hall*.

would, justifiably, not be eligible for relief under Chapter 12."). And a debtor's possession of miscellaneous assets remaining from a shuttered farm does not change the analysis.

Nevertheless, farming involves not only physical labor but also financial, operational, and management responsibilities. *See In re Mongeau*, 633 B.R. 387, 395 (Bankr. D. Kan. 2021). Whether a farming operation is ongoing on the petition date is not determined solely by whether there are crops in the field or livestock in the pen on that date. This principle is particularly important when the petition date falls between growing seasons. But it also matters when a farmer is beginning or ending an agricultural pursuit. In ordinary usage, we might say that someone is "starting up operations" or "winding down operations," and if that person is a farmer, he or she might be engaged in a farming operation even though no cultivation is underway at the moment. But we would not reach the same conclusion about someone who has merely prepared a business plan or is in the midst of liquidating substantially all of the assets of a farm, because that person is far removed from the operational phase of a farm.

2. The *Parson* precedent

I recently interpreted and applied the phrase "engaged in a farming operation" in Section 101(18)(A) in *In re Parson*, No. 25-10188 (Bankr. E.D. Mo. May 19, 2026). Because the findings of fact and conclusions of law in that case were not published, I will summarize my analysis here.

The Parsons owned a farm and various farm equipment when they filed their Chapter 12 petition in April 2025. Travis Parson, who had owned and operated a farm for fifteen years, made initial preparations to plant crops in the fall of 2024 and the spring of 2025, prior to the petition date. In the weeks leading up to the bankruptcy filing, Parson unsuccessfully attempted to obtain financing that would have enabled him to plant crops for the 2025 season. I determined that Parson likely would have planted a crop in 2025 if he had obtained the necessary financing. On the petition date, he was managing his farming operation by facilitating sales of grain from the previous year's harvest and physically assisting with the transportation of that grain. Because Parson was "in the midst of disposing of a previous season's crop and [was] genuinely preparing to plant the next season's crop, as well as addressing the financial and management tasks related thereto," I determined that the Parsons were engaged in a farming operation.

The fact that the Parsons ceased their farming operation some time post-petition and sold their farm assets thereafter did not change my decision. "[T]here is nothing in the Code that would require the debtor to remain in farming in order to obtain confirmation of a plan or to remain in farming once a plan is confirmed." *In re Lockard*, 234 B.R. 484, 491 (Bankr.

W.D. Mo. 1999). Indeed, the Bankruptcy Code permits a plan to "provide for the sale of all . . . of the property of the estate." 11 U.S.C. § 1222(b)(8). Congress has thus authorized Chapter 12 debtors to sell all estate property if it is in their interest to do so. *See Mongeau,* 633 B.R. at 396 ("It would make little sense to block a debtor from the relief provided by Congress under Chapter 12 simply because Debtors made a reasonable financial decision to end a nonprofitable farming operation which would cause the Debtors to fall deeper into debt.") (cleaned up); *In re Mikkelsen Farms, Inc.*, 74 B.R. 280, 285 (Bankr. D. Or. 1987) ("[Section 1222] reflects a recognition by Congress that many family farm reorganizations, to be successful, will involve a scaling down of the farm operation."). Additionally, Sections 1225 and 1228 establish the requirements for a debtor to confirm a plan and to obtain a discharge, respectively. 11 U.S.C. §§ 1225, 1228. Neither requires, explicitly or implicitly, that the debtor have an active farming operation at the time. As the Eighth Circuit recognized years ago, a debtor does not forfeit the benefits of Chapter 12 by closing down an operation post-petition. *See Harmon v. United States ex rel. Farmers Home Administration,* 101 F.3d 574, 585 (8th Cir. 1996).

3. Application to the Debtors' cases

Chapter 12 is intended to allow family farmers to restructure their farming operations and to continue farming if they are able to do so. *See* H.R. Rep. No. 99-958, at 48 (1986) (Conf. Rep.), *as reprinted in* 1986 U.S.C.C.A.N. 5246, 5249. But nothing in the Code or the legislative history suggests that Congress intended Chapter 12 to benefit debtors who had ceased active farming and had sold substantially all of their farm assets long before filing a bankruptcy petition. *See Nelson*, 291 B.R. at 869 (noting that debtor who permanently discontinues operations pre-petition is not eligible for Chapter 12); *Hettinger*, 95 B.R. at 112 ("Obviously, when a farm debtor sells off his equipment and livestock, elects not to plant a crop, and rents his land on a cash basis, there is a strong presumption that the individual is liquidating and is no longer a farmer."); *In re Burke*, 81 B.R. 971, 976 (Bankr. S.D. Iowa 1987) ("[T]he focus must be on the 'continuation' of farming endeavors and not on reviving abandoned operations."); *In re Haschke*, 77 B.R. 223, 225 (Bankr. D. Neb. 1987) (concluding that debtors who sold all equipment, leased all farmland for cash rent, and obtained off-farm employment before petition date were not engaged in farming operation).

Unlike the Parsons, who had recently harvested a crop and had made preparations to plant another when they commenced their Chapter 12 case, Morgan last planted a crop in 2023, more than two years before he commenced his case, and he sold most of his farm assets more than one year before the petition date. He worked as a farm manager for Victoria Partnership, an entity in which he does not have an ownership interest, for more than two years before he sought bankruptcy protection. *See Burke*, 81 B.R. at 977 ("'Farming activity'

will be liberally construed but must somehow relate to the debtor's farming operation, not the farming operation of others."). He argues that he was engaged in certain activities—selling miscellaneous assets, monitoring government programs to see whether they might yield additional income relating to the years in which he planted crops, and collecting on a note he received in exchange for the sale of a grain bin—that should be considered a part of the management of a farming operation. Perhaps they would be, if Morgan had an operating farm on the petition date to which these activities related. But in context, with production long since ended and most of Morgan's farm assets already sold, these clean-up activities do not constitute a farming operation.

The Worleys last planted crops in 2024, and they sold substantially all of the assets used in their row-crop operation, including grain remaining from 2024, before they commenced their Chapter 12 case. Jacob Worley worked elsewhere on the petition date, and Tonya Worley has since begun to work in a non-agricultural job. Unlike Morgan, they retained some land around which they may be able to organize a productive operation. But nothing in the record demonstrates that the Worleys' shift from planting 4,500 acres of soybeans and rice to cultivating 15 acres of pecans and 151 acres of soybeans was part of a plan, or continuous, or otherwise fairly characterized as part of an ongoing farming operation. Rather, on the petition date, they were in a gap between two distinct farming operations, and they were not engaged in either one.[5] The Worleys also point to issues derived from their former operation, such as accrual of interest on their debts, a lawsuit by a creditor, and the possibility of supplemental payments from the government. As in Morgan's case, in light of the advanced state of the wind-down of the Worleys' row-crop endeavor, these trailing matters do not amount to a farming operation on the petition date.

The Debtors argue that they should not lose the benefit of Chapter 12 merely because they made sound business decisions to cease planting and to sell assets. *See, e.g., Hettinger*, 95 B.R. at 112 (holding that debtor may remain a family farmer if "his conduct is based on sound business judgment that in order to save the farming business, it is necessary in the present and immediate future to take such drastic steps"). I have no doubt that the Debtors' decisions were sound, but their business judgment resulted in the termination of their farming operation—as opposed to changing its focus, scaling it down, placing it in the hands of a third party for a time, or the like—after which point they were no longer engaged in that operation. The cases

---

[5] To be clear, a change in the nature or scope of a farming operation does not itself disqualify a debtor from eligibility under Chapter 12. *See Knudsen*, 581 F.3d at 714. But the cessation of one farming operation pre-petition, followed by the commencement of a distinct farming operation post-petition, may be disqualifying if it means that the debtor is not engaged in either operation on the petition date.

on which the Debtors primarily rely involve distinct facts. *See Hettinger*, 95 B.R. at 111 (debtor rented farm to neighbor for two years);[6] *Mikkelsen Farms*, 74 B.R. at 282-83 (debtor filed in December after harvesting crops that year and agreeing to lease land to third party for following year); *In re Williams*, No. 15-11023(1)(12), 2016 WL 1644189, at *2 (Bankr. W.D. Ky. Apr. 22, 2016) (debtors arranged for son to plant and harvest crops, but debtors bore all economic risks of operation).

The Debtors also assert that the requirements of the income test in Section 101(18)(A) demonstrate that a debtor need not be actively farming on the petition date. This is only partially accurate. A debtor who did not receive any income from a farming operation in the tax year before the petition date may still pass the income test if a majority of the debtor's income in the two years before that derived from a farming operation. *See* 11 U.S.C. § 101(18)(A). But, as noted above, eligibility for Chapter 12 has five requirements; satisfaction of the income test does not necessarily mean that a debtor is engaged in a farming operation on the petition date.[7]

The Debtors clearly would prefer to be actively farming today, and they would have preferred to have been farming without interruption as they entered Chapter 12. But on the facts here, the only thing that ties their past farming operations to their contemplated future farming operations is their desire to farm (and, relatedly, their sense of identity as farmers). This is understandable, and it is commendable. But the Bankruptcy Code requires an "individual" to be "engaged in a farming operation," which means that the operation must be something beyond the individual himself or herself. *See generally Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161-62 (2001) (discussing distinction under RICO between "enterprise" and "person" who conducts affairs of enterprise).

---

[6] The *Hettinger* opinion states that the debtors planted a crop on their land in 1988, and the Court's records indicate that they commenced their Chapter 12 case on July 28, 1988. Thus, regardless of whether the Hettingers satisfied the income test, it seems clear that they were engaged in a farming operation on their petition date.

[7] The income test measures whether the debtor's income comes from "such farming operation," which refers to the "farming operation owned and operated by [the debtor]" that has produced at least 50% of the debtor's noncontingent, liquidated debts. 11 U.S.C. § 101(18)(A). The farming operation that the debtor is "engaged in" on the petition date need not be the same farming operation referred to in the income test and the 50%-of-debt test. *See id.; In re Hemann*, No. 11-261, 2013 WL 1385404, at *7 (Bankr. N.D. Iowa Apr. 3, 2013). Thus, a debtor who closes a farming operation, does not engage in farming for a time, and begins a new farming operation pre-petition may qualify for Chapter 12 relief.

### B. What Is the Significance of the Debtors' Plans for the Future?

The Debtors intend to return to farming, although when and how they will do so is somewhat unclear. Some courts have treated a debtor's intentions regarding farming in the future as particularly significant to the question whether the debtor is engaged in a farming operation on the petition date. *See, e.g., In re Watford*, 898 F.2d 1525, 1528 (11th Cir. 1990) (describing question as whether "debtor intends to continue to engage in a 'farming operation' even though he or she was not engaged in the physical activity of farming at the time the petition was filed"); *In re Paul*, 83 B.R. 709, 713 (Bankr. D.N.D. 1988) (distinguishing between "farmers who, on a long-term basis, intend to continue to farm" and "debtors who have abandoned their farming operation and have no intention of returning to traditional agricultural production under the protection of Chapter 12").

I agree with these courts to some degree, but I part ways in other respects. A debtor's intent as to the future may be particularly important when a farming operation is on the brink of closure. The reality of agriculture, like business more generally, is that sometimes the distinction between a going concern and a defunct venture depends entirely on what the owner plans to do next. In addition, a debtor's evidence that a farming operation will continue into the future, and how it will continue, may help to demonstrate that the debtor has been engaged in that operation all along. On the other hand, sometimes the debtor's intent is not relevant. If the debtor is engaged in a farming operation on the petition date but plans to wind the operation down post-petition, the debtor's intent does not disqualify him or her from relief under Chapter 12. As stated above, the Bankruptcy Code contemplates that a debtor may liquidate a farm. For similar reasons, if a debtor plainly is not engaged in a farming operation on the petition date, even a sincere, well-planned intent to revive an endeavor or to start a new one post-petition does not matter. *See Tim Wargo & Sons,* 74 B.R. at 472 ("There is nothing in the legislative history to indicate that Congress intended chapter 12 to act as a vehicle for reviving abandoned operations."), *aff'd,* 86 B.R. 150 (E.D. Ark. 1988), *aff'd,* 869 F.2d 1128 (8th Cir. 1989).

Precedent from a related context is instructive here. In *In re LaFond*, 791 F.2d 623 (8th Cir. 1986), the court considered the debtors' motion to avoid a bank's lien on farm equipment, arguing that it impaired an exemption in tools of their trade—namely, farming. Although the debtors had lost their farmland and Jerome LaFond was employed as a police officer, the court held that they could avoid the lien because they "have invested over $20,000 in their current farming operations, and continue in their bona fide effort to earn a living at farming." *Id.* at 626; *see also In re LaFond*, 45 B.R. 195, 197 (Bankr. D. Minn. 1984), *aff'd*, 61 B.R. 303 (D. Minn. 1985), *aff'd*, 791 F.2d 623 (8th Cir. 1986). The Bankruptcy Appellate Panel considered a similar issue in *In re Johnson*, 230 B.R. 608 (B.A.P. 8th Cir. 1999). But in that

case, the debtor conceded that "he is not currently engaged in the activity of farming, he has not farmed since 1996, and he does not know exactly when he will resume farming." *Id.* at 610. The Panel held that the debtor's "hopes or intentions to farm with his brother when his father retires some time in the future" were insufficient to permit him to avoid a lien on tools of the farming trade. *Id.* at 611.

The lien-avoidance cases do not involve the definition of "family farmer" in Section 101(18)(A), and thus they do not control the outcome here. Nevertheless, they make an important point: a debtor's intent to farm in the future does not make the debtor a farmer today if he or she is not otherwise a farmer today. Evidence of intent may help to demonstrate that a farm that appears to be inactive really is an ongoing operation, but it cannot establish that a debtor remains engaged in a farming operation after that operation has been terminated.

But even if I agreed with the Debtors, and some of the cases, that a debtor's concrete plans for the future may excuse a lack of engagement in a farm operation at present, the evidence of the Debtors' intent here is insufficient.[8] Morgan has not presented any specific plans for his new farming operation. It is unknown at this point when he would start farming again, what crops he would grow, where he would farm, or the size of the operation. This new farming operation is only speculative at this point, and his plan suggests that it would not get underway before 2030. The Worleys intend to plant on the Woods Patch and some newly leased land and to harvest pecans from their orchard. But at the time of the hearing, months after their petition date, they had taken only preliminary steps toward either enterprise. The Worleys' plans thus are indefinite and largely aspirational as well.[9]

• • • •

The Debtors argue that it is unjust to deny relief under Chapter 12 to a debtor who liquidates farm assets pre-bankruptcy in an effort to reduce debt, considering that a debtor may pursue the same course post-petition. To this I might add that one of the principal benefits of Chapter 12—relief from significant capital-gains taxes—is important not only to

---

[8] *Hettinger* would require "clear and convincing evidence that [the debtor's conduct] is based on sound business judgment . . . to save the farming business." 95 B.R. at 112. For purposes of this discussion, I assume that the more typical preponderance-of-the-evidence standard would govern.

[9] The Government argues that the Debtors concocted their future farming plans post-petition in response to the motions to dismiss. I need not decide this question, for even if the Debtors' business plans had been fully formed on their petition dates, they were so far from being realized that they would not have constituted farming operations.

debtors who continue to operate farms, but also to those who cease farming operations, whether pre-petition or post-petition, and pursue employment outside of agriculture. Nevertheless, in setting the eligibility requirements for Chapter 12, Congress drew a number of lines, any of which might be criticized as arbitrary in a particular case. Whether or not the requirement that a debtor be engaged in a farming operation on the petition date is optimal as a matter of public policy, Congress has established that requirement, and the Debtors have not satisfied it.

## IV. Conclusion

For these reasons, I conclude that the Debtors are not eligible to be debtors under Chapter 12.

Dated: October 28, 2026
St. Louis, Missouri
cjs

Brian C. Walsh
United States Bankruptcy Judge